1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    ADAM MICHAEL KENDALL,                    No. 2:24-cv-3801 DAD CSK P

12                    Plaintiff,               ORDER

13          v.

14    BRAZIL, et al.,

15                    Defendants.

16

17          Plaintiff is a state prisoner proceeding pro se.  Plaintiff seeks relief pursuant to 42 U.S.C.

18    § 1983 and requests leave to proceed in forma pauperis pursuant to 28 U.S.C. § 1915.  On March

19    17, 2025, plaintiff filed a first amended complaint ("FAC").  This proceeding was referred to this

20    Court by Local Rule 302 pursuant to 28 U.S.C. § 636(b)(1).

21          Plaintiff submitted a declaration that makes the showing required by 28 U.S.C. § 1915(a).

22    Accordingly, the requests to proceed in forma pauperis (ECF Nos. 3, 23) are granted.

23          Plaintiff is required to pay the statutory filing fee of $350.00 for this action.  28 U.S.C.

24    §§ 1914(a), 1915(b)(1).  By this order, plaintiff is assessed an initial partial filing fee in

25    accordance with the provisions of 28 U.S.C. § 1915(b)(1).  By separate order, the Court will

26    direct the appropriate agency to collect the initial partial filing fee from plaintiff's trust account

27    and forward it to the Clerk of the Court.  Thereafter, plaintiff is obligated to make monthly

28    payments of twenty percent of the preceding month's income credited to plaintiff's trust account.

1    These payments will be forwarded by the appropriate agency to the Clerk of the Court each time

2    the amount in plaintiff's account exceeds $10.00, until the filing fee is paid in full.  28 U.S.C.

3    § 1915(b)(2).

4         As discussed below, plaintiff's FAC is dismissed with leave to file a second amended

5    complaint that does not exceed 25 pages, and that only includes claims arising from the same

6    transaction, occurrence, or series of transactions and occurrences in which all named defendants

7    were involved.  Fed. R. Civ. P. 20(a)(2).

8    **I.    BACKGROUND**

9         On December 30, 2024, plaintiff filed a 252 page document consisting of a 101 page

10   complaint and 151 pages of exhibits and cover sheets, and a request for leave to file a complaint

11   longer than 25 pages.[1]  (ECF Nos. 1, 1-2.)  Plaintiff also filed two applications to proceed in

12   forma pauperis.  (ECF Nos. 3, 3-1.)  On January 23, 2025, the CDCR filed a certified trust

13   account statement for plaintiff.  (ECF No. 6.)  On February 5, 2025, plaintiff filed another motion

14   to file a complaint longer than 25 pages.  (ECF No. 12.)  On March 17, 2025, plaintiff filed a

15   motion to amend (ECF No. 16), accompanied by a 286 page filing, including a 103 page FAC

16   (ECF No. 17 at 1-103), and 182 pages of exhibits and a proof of service (id. at 104-286).

17   **II.    MOTION TO AMEND**

18        Because the original complaint had not yet been screened or served on defendants, no

19   responsive pleading has been filed.  Therefore, plaintiff is allowed to amend his complaint as of

20   right.  Fed. R. Civ. P. 15(a).  Plaintiff's motion to amend (ECF No. 16) is denied as moot, and the

21   Court turns now to plaintiff's motion to exceed the 25 page limit.

22   **III.    PAGE LIMIT**

23        Plaintiff renewed his request for leave to file a complaint exceeding 25 pages, claiming

24   there was "simply no way for the plaintiff to stay within 25 page requirement for electronic filing

25   and properly plead his claims."  (ECF No. 12 at 2.)

26

27   _____

[1]  Plaintiff also filed a motion for injunctive relief, which the Court recommended denying, and
28   the findings and recommendations were adopted by the district court on June 20, 2025.  (ECF
     Nos. 2, 15, 21.)

1    Plaintiff is advised that prisoners seeking to file complaints electronically must submit a

2    complaint, including exhibits, that does not exceed 25 pages.  Here, plaintiff's FAC far exceeds

3    this page limit; the entire filing is 286 pages, including the 103 page FAC, and 177 pages of

4    exhibits.  Plaintiff was required to obtain written permission from the Court before filing such a

5    lengthy pleading.  However, under the circumstances the Court grants plaintiff's request, nunc

6    pro tunc, and screens plaintiff's FAC (ECF No. 17).  Plaintiff is cautioned, however, that in the

7    future he must seek written permission prior to filing such a lengthy pleading.  As noted in the

8    instructions for a prisoner electronically filing a civil rights complaint in this district, plaintiff's

9    complaints should not exceed 25 pages.  Indeed, the court's civil rights complaint form helps

10    litigants plead the facts of their claims in a short and plain manner, as required under Rule 8 of

11    the Federal Rules of Civil Procedure.

12    **IV.    SCREENING STANDARDS**

13    The court is required to screen complaints brought by prisoners seeking relief against a

14    governmental entity or officer or employee of a governmental entity.  28 U.S.C. § 1915A(a).  The

15    court must dismiss a complaint or portion thereof if the prisoner raised claims that are legally

16    "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek

17    monetary relief from a defendant who is immune from such relief.  28 U.S.C. § 1915A(b)(1), (2).

18    A claim is legally frivolous when it lacks an arguable basis either in law or in fact.

19    Neitzke v. Williams, 490 U.S. 319, 325 (1989); Franklin v. Murphy, 745 F.2d 1221, 1227-28 (9th

20    Cir. 1984).  The court may, therefore, dismiss a claim as frivolous when it is based on an

21    indisputably meritless legal theory or where the factual contentions are clearly baseless.  Neitzke,

22    490 U.S. at 327.  The critical inquiry is whether a constitutional claim, however inartfully

23    pleaded, has an arguable legal and factual basis.  See Jackson v. Arizona, 885 F.2d 639, 640 (9th

24    Cir. 1989), superseded by statute as stated in Lopez v. Smith, 203 F.3d 1122, 1130-31 (9th Cir.

25    2000) ("[A] judge may dismiss [in forma pauperis] claims which are based on indisputably

26    meritless legal theories or whose factual contentions are clearly baseless."); Franklin, 745 F.2d at

27    1227.

28    Rule 8(a)(2) of the Federal Rules of Civil Procedure "requires only 'a short and plain

3

1  statement of the claim showing that the pleader is entitled to relief,' in order to 'give the

2  defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atlantic

3  Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).

4  In order to survive dismissal for failure to state a claim, a complaint must contain more than "a

5  formulaic recitation of the elements of a cause of action;" it must contain factual allegations

6  sufficient "to raise a right to relief above the speculative level." Bell Atlantic, 550 U.S. at 555.

7  However, "[s]pecific facts are not necessary; the statement [of facts] need only 'give the

8  defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Erickson v.

9  Pardus, 551 U.S. 89, 93 (2007) (quoting Bell Atlantic, 550 U.S. at 555, citations and internal

10  quotations marks omitted).  In reviewing a complaint under this standard, the court must accept as

11  true the allegations of the complaint in question, Erickson, 551 U.S. at 93, and construe the

12  pleading in the light most favorable to the plaintiff.  Scheuer v. Rhodes, 416 U.S. 232, 236

13  (1974), overruled on other grounds, Davis v. Scherer, 468 U.S. 183 (1984).

14  **V.    PLAINTIFF'S FIRST AMENDED COMPLAINT**

15      Plaintiff's FAC names 41 defendants:  forty employed at Mule Creek State Prison

16  ("MCSP") (39 prison guards and Warden Patrick Covello); and one defendant employed as the

17  Secretary of the California Department of Corrections and Rehabilitation ("CDCR"), Jeff

18  Macomber.  (ECF No. 17 at 14-15.)  Plaintiff also names "unknown defendants at the office of

19  the inspector general."  (Id. at 15.)  Plaintiff alleges retaliation, falsification of documents, and

20  systemic retaliation in violation of the First Amendment, unreasonable strip search in violation of

21  the Fourth Amendment, excessive force in violation of the Eighth Amendment, deliberate

22  indifference in violation of the Eighth Amendment, and state law claims including violation of

23  California Civil Code § 1572, "assault and battery," and "deprivation of property."  (Id. at

24  14.)  Plaintiff claims that all of these violations occurred while he was housed at MCSP from

25  March 22, 2024 to October 10, 2024, and resulted in plaintiff being issued 17 rule violation

26  reports ("RVRs"), more than he has received at any other prison in eight years, all allegedly in

27  retaliation for plaintiff filing grievances or advising the correctional officer that plaintiff would

28  / / /

1  file a grievance, which plaintiff alleges constitutes systemic retaliation.[2]  (Id. at 15.)  Plaintiff

2  alleges that every time he would "use free speech; say [he] will file a grievance, say [he] will file

3  suit, or even ask a prison guard for his name, [plaintiff] received an RVR."  (Id.)  Plaintiff alleges

4  that "the retaliation was so bad at MCSP [he] was confined to [his] cell," only leaving "to go to

5  canteen, law library or an RVR hearing," and stopped going to dinner because after 2:00 p.m. the

6  retaliation was worse.  (Id. at 16.)  Plaintiff included multiple claims based on numerous

7  incidents.  (Id. at 17-85.)

8      In addition, plaintiff states he obtained his paralegal certificate with honors and has

9  finished nearly half of the requisite textbooks for the first year of law school with an eye toward

10  taking the first year law school exam.  However, plaintiff alleges that these repeated issuances of

11  RVRs and retaliatory acts have stopped his studies, and he cannot take college classes now

12  because he is currently housed in administrative segregation ("ASU") at CSP-COR because he

13  "was attacked by MCSP prison guards."  (Id. at 16.)

14      As relief, plaintiff seeks a declaratory judgment; an injunction requiring Warden Covello

15  to require every prison guard to wear a body camera, to record all inmates' disciplinary hearings,

16  immediately address the systemic retaliation and other misconduct at MCSP, and halt training any

17  new prison guards for MCSP "until the systemic retaliation is rooted out and the toxic culture of

18  MCSP changed;" and an injunction preventing plaintiff's return to MCSP, restoring plaintiff's

19  level 3 override; an order appointing a special master to carry out the injunction; and

20  compensatory and punitive damages.  (ECF No. 17 at 86-103.)

21  **VI.    MISJOINDER**

22      Plaintiff's lengthy FAC alleges numerous violations of his First, Fourth, and Eighth

23  Amendment rights, including supplemental state law claims, against 41 defendants arising from

24  numerous separate incidents at MCSP from March 22, 2024, to October 10, 2024.  In addition,

25  plaintiff joins these allegations together under a putative "systemic retaliation" theory.  Plaintiff

26

27  _____

[2]  In his earlier motion for injunctive relief, plaintiff states he has no previous offense punishable
28  by administrative segregation, "no violence in eight years, but one fight in 2019, no serious RVRs
   for 3 years, and has yet to be convicted of anything."  (ECF No. 2 at 12.)

1    seeks wide-ranging declaratory and injunctive relief, and money damages.

2         Rule 21 of the Federal Rules of Civil Procedure provides:

3         Misjoinder of parties is not a ground for dismissing an action. On
          motion or on its own, the court may at any time, on just terms, add
4         or drop a party. The court may also sever any claim against a party.

5    Fed. R. Civ. P. 21.  Rule 20(a) provides that all persons may be joined in one action as defendants

6    if "any right to relief is asserted against them jointly, severally, or in the alternative with respect

7    to or arising out of the same transaction, occurrence, or series of transactions or occurrences" and

8    "any question of law or fact common to all defendants will arise in the action."  Fed. R. Civ. P.

9    20(a)(2); see also George v. Smith, 507 F.3d 605, 607 (7th Cir. 2007) ("Unrelated claims against

10   unrelated defendants belong in different suits").  If unrelated claims are improperly joined, the

11   court may dismiss them without prejudice.  Fed. R. Civ. P. 21; 7 Alan Wright, Arthur Miller &

12   Mary Kay Kane, Richard Marcus, Federal Practice and Procedure § 1684 (3d ed. 2012); Michaels

13   Building Co. v. Ameritrust Co., 848 F.2d 674, 682 (6th Cir. 1988) (affirming dismissal under

14   Rule 21 of certain defendants where claims against those defendants did not arise out of the same

15   transaction or occurrences, as required by Rule 20(a)).  Here, plaintiff's claims arose from myriad

16   different incidents involving different defendants, and therefore are not properly joined in one

17   action.

18        Here, plaintiff is attempting to join, under a putative "systemic retaliation" theory, myriad

19   unrelated claims against numerous defendants in one action.  Unrelated claims must be filed in

20   separate lawsuits.  K'napp v. Cal. Dept. of Corr., 2013 WL 5817765, at *2 (E.D. Cal. Oct. 29,

21   2013), aff'd sub nom. K'napp v. Cal. Dept. of Corr. & Rehab., 599 F. App'x 791 (9th Cir. 2015)

22   (citation omitted).  In other words, joining more than one claim in a single complaint is proper

23   when the claims are against the same defendant, but joining multiple defendants in one complaint

24   is proper only if the claims against them are based on the same facts.  This rule is intended "to

25   prevent the sort of morass [a multiple claim, multiple defendant] suit produce[s]."  See George,

26   507 F.3d at 607.  Plaintiff's claims do not arise from the same transaction or occurrence in which

27   all defendants were involved.  Plaintiff alleges all of the defendants retaliated against him, but as

28   discussed in more detail below, most of the circumstances differed, and occurred over varying

6

1  time frames involving different defendants, and most of his allegations do not state cognizable
2  retaliation claims.

3        Where parties have been misjoined, the court may dismiss a party or sever the claims
4  against that party.  Fed. R. Civ. P. 21.  "[D]istrict courts who dismiss rather than sever must
5  conduct a prejudice analysis, including 'loss of otherwise timely claims if new suits are blocked
6  by statutes of limitations.'"  Rush v. Sport Chalet, Inc., 779 F.3d 973, 975 (9th Cir. 2015)
7  (quoting DirecTV, Inc. v. Leto, 467 F.3d 842, 846-47 (3d Cir. 2006)).  Because 42 U.S.C. § 1983
8  does not have its own statute of limitations, district courts apply California's statute of limitations
9  for personal injury actions and California's laws regarding equitable tolling, except to the extent
10  any of these laws is inconsistent with federal law.  See Jones v. Blanas, 393 F.3d 918, 927 (9th
11  Cir. 2004).  California's statute of limitations for personal injury actions is two years.  See Cal.
12  Civ. Proc. Code § 335.1; Maldonado v. Harris, 370 F.3d 945, 954-55 (9th Cir. 2004).

13        Here, because the unrelated claims are based on numerous different incidents that took
14  place in 2024, plaintiff will not be prejudiced by their dismissal, without prejudice, from this
15  action.  Plaintiff may pursue such claims in separate, timely actions.  See also George, 507 F.3d at
16  607 ("Unrelated claims against unrelated defendants belong in different suits").  Further,
17  plaintiff's improper joinder of his myriad claims cannot be remedied by dismissal of the unrelated
18  claims from this action because it is unclear which claims he will decide to pursue in this action,
19  and which claims he will choose to pursue in separate lawsuits.  See Fed. R. Civ. P. 21.  Thus,
20  plaintiff's FAC must be dismissed because he has joined, in one pleading, unrelated claims that
21  do not all arise from the same transaction or occurrences, by the same defendants,
22  notwithstanding plaintiff's effort to connect such incidents by claiming "systemic retaliation."
23  Plaintiff is granted leave to file a second amended complaint in which he raises only those claims
24  arising from the same transaction, occurrence, or series of transactions and occurrences in which
25  all of the named defendants were involved.

26  **VII.     COGNIZABLE RETALIATION CLAIMS**

27        Plaintiff's FAC contains multiple retaliation claims against several different defendants,
28  but most of the allegations do not state cognizable retaliation claims.  The Court first addresses

the standards governing retaliation claims and the cognizable retaliation claims before turning to the non-cognizable retaliation claims.[3]

A. Standards Governing Retaliation Claims

"Prisoners have a First Amendment right to file grievances against prison officials and to be free from retaliation for doing so."  Watison v. Carter, 668 F.3d 1108, 1114 (9th Cir. 2012) (citing Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009)).  In addition, threatening to file an inmate grievance has been deemed protected conduct by the court.  See Gleason v. Placensia, 2020 WL 3497001, at *3 (E.D. Cal. June 29, 2020) (citations omitted) (recognizing courts have considered a request to obtain a grievance form or merely threatening to file a grievance within the purview of actions protected by the First Amendment); Hackworth v. Arevalos, 2022 WL 18027835, at *7 (E.D. Cal. Dec. 30, 2022) ("Threatening to file an inmate grievance is also protected activity."), report and recommendation adopted, 2023 WL 2751532 (E.D. Cal. March 31, 2023).

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements:  (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005).  The adverse action must be of a sufficient nature that it would deter or "chill" a person of "ordinary firmness" in the exercise of his constitutional rights.  Id. at 568-69.

Adverse action taken against a prisoner "need not be an independent constitutional violation.  The mere threat of harm can be an adverse action."  Watison, 668 F.3d at 1114 (internal citations omitted).  A causal connection between the adverse action and the protected conduct can be alleged by an allegation of a chronology of events from which retaliation can be inferred.  Id.  However, not every allegedly adverse action will support a retaliation claim.  See,

---

[3]  The Court numbered plaintiff's claims in the order in which he pled his allegations in the first amended complaint.  (ECF No. 17 at 17-85.)

1   e.g., Huskey v. City of San Jose, 204 F.3d 893, 899 (9th Cir. 2000) (retaliation claim cannot rest
2   on "the logical fallacy of post hoc, ergo propter hoc, literally, 'after this, therefore because of
3   this'") (citation omitted).

4        The plaintiff must allege specific facts demonstrating that the plaintiff's protected conduct
5   was "the 'substantial' or 'motivating' factor behind the defendant's conduct." Brodheim, 584
6   F.3d at 1271 (quoting Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir.1989))
7   Plaintiff must also plead facts which suggest an absence of legitimate correctional goals for the
8   challenged conduct. Pratt v. Rowland, 65 F.3d 802, 806 (1995) (citation omitted). Mere
9   allegations of retaliatory motive or conduct will not suffice. The plaintiff must allege either a
10  chilling effect on future First Amendment activities, or that he suffered some other harm that is
11  "more than minimal." Watison, 668 F.3d at 1114. A plaintiff successfully pleads that the action
12  did not reasonably advance a legitimate correctional goal by alleging, in addition to a retaliatory
13  motive, that the defendant's actions were "arbitrary and capricious" or that they were
14  "unnecessary to the maintenance of order in the institution." Id.

15       Finally, "not every unfavorable or unpleasant action will be sufficient to support a claim
16  under section 1983 for retaliation." Fields v. Velasco, 2012 WL 3628862, at *9 (E.D. Cal. Aug.
17  21, 2012). "In the prison context, cases in the Ninth Circuit addressing First Amendment
18  retaliation claims involve situations where the action taken by the defendant was *clearly* and
19  *significantly* adverse to the plaintiff." Id. (citing Rhodes v. Robinson, 408 F.3d at 568 (arbitrary
20  confiscation and destruction of property, initiation of a prison transfer, and assault in retaliation
21  for filing grievances); Austin v. Terhune, 367 F.3d 1167, 1171 (9th Cir. 2004) (retaliatory
22  placement in administrative segregation for filing grievances); Bruce v. Ylst, 351 F.3d 1283, 1288
23  (9th Cir. 2003) (retaliatory validation as a gang member for filing grievances); Hines v. Gomez,
24  108 F.3d 265, 267 (9th Cir. 1997) (retaliatory issuance of false rules violation and subsequent
25  finding of guilt); Pratt, 65 F.3d at 806 (retaliatory prison transfer and double-cell status); Rizzo v.
26  Dawson, 778 F.2d at 530-32 (retaliatory reassignment out of vocational class and transfer to a
27  different prison).) Verbal harassment alone is insufficient to state a constitutional deprivation
28  under 42 U.S.C. § 1983. See Oltarzewski v. Ruggiero, 830 F.2d 136, 139 (9th Cir. 1987).

1      B. <u>Second Claim – Defendant Brazil</u>

2          In his second claim, plaintiff alleges defendant Brazil issued a false RVR in retaliation for

3   plaintiff telling Brazil that plaintiff would be filing a grievance, and then filed a grievance.  While

4   plaintiff was moving his property into his cell on March 26, 2024 around 9:56 a.m., defendant

5   Brazil got on the microphone and began rushing plaintiff to move faster.  (ECF No. 17 at 19.)

6   Plaintiff paused and told defendant Brazil that plaintiff was moving his property into the cell and

7   Brazil's rushing plaintiff over the loud speaker would not hasten the process.  (Id.)  Plaintiff took

8   about thirteen more minutes to finish moving his property.  Around 10:20 a.m., plaintiff walked

9   over to the tower to speak to Brazil, who was "immediately hostile" and spoke to plaintiff

10  "rudely."  (Id.)  Plaintiff told defendant Brazil that plaintiff was going to file a grievance on him,

11  and Brazil responded that he would write plaintiff up for "disrespecting staff."  (Id.)  Plaintiff

12  returned to his cell and wrote a grievance.  (Id. at 19-20, 112-13)

13         In April 2024, plaintiff was issued a false rules violation report ("RVR") by defendant

14  Brazil for "disobeying a direct order."  (Id. at 20, 117 (RVR dated April 4, 2024).)  On May 2,

15  2024, accompanied by investigative employee and prison guard Hughes, plaintiff reviewed video

16  footage from the March 26, 2024 incident which demonstrated that defendant Brazil's allegations

17  in the RVR were demonstrably false, and plaintiff had not disobeyed a direct order.  (Id. at 20.)

18  Plaintiff alleges that "prison guard Hughes agreed the RVR was ridiculous[,] and he could be

19  spending his time tending to more important matters."  (Id.)  Plaintiff was found not guilty.  (Id.

20  at 122-23.)

21         Plaintiff's claim that defendant Brazil issued a false RVR in retaliation for plaintiff telling

22  Brazil that plaintiff would be filing a grievance, and then filed a grievance, is sufficient to state a

23  potentially cognizable retaliation claim.[4]  See Gleason, 2020 WL 3497001, at *3.

24  ///

25  _____

26  [4]  In plaintiff's second and some subsequent claims, plaintiff alleges "falsification of documents," as if it is a separate claim.  Filing false documents is the adverse action in retaliation claims, and

27  is not a separate civil rights violation.  See Koch v. Austin, 2006 WL 403818, at *5 (E.D. Cal. Feb. 16, 2006), findings and recommendations adopted, 2006 WL 842585 (E.D. Cal. Mar. 28,

28  2006).  The Court does not separately address plaintiff's "falsification of documents" claims.

C. Fourth Claim – Defendant Brazil

In his fourth claim, plaintiff alleges that on April 16, 2024, while plaintiff was attempting to pick up his mail in the program office, defendant Brazil refused to allow plaintiff to sign the form without speaking, and began harassing plaintiff, asking questions Brazil already knew the answer to, and at one point stating Brazil would not give plaintiff his legal mail. (ECF No. 17 at 23.) Plaintiff told Brazil that plaintiff would be filing a grievance on him and taking him to court for his continued retaliation, left and returned to his building. (Id.) Plaintiff found no grievances in their usual location, so asked prison guards Melrose and Zaragoza if they could provide plaintiff with a grievance. (Id.) There were none in the building, so Zaragoza asked plaintiff to get some grievance forms from the program office. (Id.) When plaintiff arrived in the program office, Brazil was still there handing out inmate mail; plaintiff tried not to engage Brazil, but Brazil immediately began yelling. (Id. at 24.) Plaintiff tried to ignore Brazil and began knocking on the door frame to the superior's offices calling for help. Brazil yelled more aggressively, and then began yelling, "cuff up!" (Id.) Defendant Sgt. Cusic left his office and plaintiff told Sgt. Cusic that plaintiff was sent to the program office by prison guards to retrieve grievance forms and asked Sgt. Cusic to restrain his subordinate. (Id.) Despite surveilling the situation, Sgt. Cusic did nothing. (Id.) Defendant Warren came into the room, and Brazil hit the alarm. Because plaintiff saw that Brazil and Warren intended to use force against plaintiff, plaintiff took a seat on the floor with his legs crossed and his hands up palms faced out to show plaintiff posed no threat. (Id.) Plaintiff reiterated he had been sent by prison guards Zaragoza and Melrose to pick up grievance forms. (Id.) The guards continued to yell over plaintiff "prone out!" (Id.) Warren cursed at plaintiff, took out his baton and cracked it open by plaintiff's ear, yelling "prone out!" (Id.) Defendant Sergent entered the room and Brazil left briefly and returned. (Id.) Almost as soon as Sergent arrived, she began cursing at plaintiff, and when he asked her why, she told plaintiff "Fuck you!" (Id.) Plaintiff took out a small pen and paper from his pocket and wrote down her name, and then told Sergent plaintiff would be filing a grievance on her. Sergent called plaintiff a "little bitch!" The prison guards continued yelling and cursing at plaintiff awhile longer but ultimately allowed plaintiff to get up and leave. (Id.) When plaintiff returned to his

11

building, he asked Zaragoza to call the sergeant's office and let Sgt. Cusic and the other guards know that plaintiff was sent to the program office by Zaragoza and Melrose, which Zaragoza later did.  (Id.)  Plaintiff learned later that Brazil had briefly left the room to turn on a large fan that would drown out the audio.  (Id.)

Plaintiff's allegations as to defendant Brazil state a cognizable retaliation claim based on the proximity in time to the false RVR and Brazil's refusal to provide plaintiff's mail.[5]

D.  Fifth Claim – Defendant Sergent

In his fifth claim, plaintiff alleges that on April 22, 2024, he received an RVR issued by defendant Sergent, who falsely claimed plaintiff cursed at the guards and falsely denied that she or any of the guards called plaintiff a bitch or other derogatory term.  (ECF No. 17 at 26, 131-32 (RVR).)  Plaintiff claims Sergent wrote a false RVR in retaliation for plaintiff's protected conduct – "filing grievances, taking names, and using [his] free speech to tell guards that [he] will file grievances and access courts."  (Id.)

Plaintiff's fifth claim states a potentially cognizable retaliation claim against Sergent based on her issuance of a false RVR in retaliation for plaintiff telling her he would file a grievance against her.  See Gleason, 2020 WL 3497001, at *3.

E.  Sixth Claim – Defendant Brazil

In his sixth claim, plaintiff alleges that defendant Brazil also issued a false RVR against plaintiff based on the April 16, 2024 incident.  (ECF No. 17 at 26.)  Plaintiff alleges that Brazil

---

[5]  However, plaintiff fails to demonstrate that the remaining defendants' actions were taken based on plaintiff's protected conduct.  Sgt. Cusic's failure to "restrain his subordinate" as requested by plaintiff does not constitute retaliation where plaintiff alleges no facts showing the failure to act was based on plaintiff's First Amendment activity.  Similarly, there are no allegations that defendants Warren and Sergent were acting in response to plaintiff's protected activity; rather, given their late arrival, it is just as likely they were responding to plaintiff's failure to prone out, a legitimate penological response.  But even after plaintiff informed Sergent that plaintiff would be filing a grievance against her, other than yelling and cursing, in this claim, plaintiff identifies no adverse action by her that would constitute retaliation.  Verbal harassment, including cursing, is insufficient to state a constitutional deprivation under 42 U.S.C. § 1983.  See Oltarzewski, 830 F.2d at 139.  Plaintiff admits that these defendants eventually let him leave.  As noted above, not every unfavorable or unpleasant action will be sufficient to support a claim under section 1983 for retaliation.  Plaintiff's fails to state cognizable retaliation claims against Warren, Sergent, and Sgt. Cusic.

"manufactured the conditions" of the incident, and falsely claimed he used "de-escalation techniques." (Id. (quoting ECF No. 17 at 133).)  Plaintiff avers that none of the guards, including Brazil, attempted to de-escalate the situation but rather attempted to provoke a situation where they could use force.  (ECF No. 17 at 27.)  Plaintiff was found not guilty of the RVR.  (Id.)

Plaintiff states a potentially cognizable retaliation claim against defendant Brazil based on his alleged falsification of the RVR in retaliation for plaintiff's protected conduct.

F.  Eighth Claim – Defendant Cruz

In his eighth claim, plaintiff alleges on April 29, 2024, as plaintiff was headed to the law library with PLU status, his hands were full, and he was trying to make the unlock, which occurs every half hour.  (ECF No. 17 at 29.)  Cruz was walking in the same direction.  Plaintiff went to walk around Cruz, who turned and yelled, "I don't like you walking behind me!"  (Id.)  Plaintiff told Cruz "I'm not worried about you," and tried to continue to the law library.  (Id.)  Cruz stepped in plaintiff's way, and as plaintiff tried to go in another direction, Cruz again stepped in plaintiff's way.  (Id. at 30.)  Cruz told the prison guard holding the library door not to let plaintiff into the law library.  (Id.)  Plaintiff told Cruz and the other prison guard that plaintiff was PLU status because he was suing prison guards, and if they wanted to impede plaintiff's court access, he could also make them a party to a  suit.  (Id.)  Plaintiff took Cruz's name and told her plaintiff would be writing her up.  Cruz asked for plaintiff's identification card and said, "I'm writing you up for disrespect!"  (Id.)  Plaintiff replied, "Disrespect?  At what point did I disrespect you?"  Cruz replied, "I'm writing you up for disobeying an order!"  (Id.)  After plaintiff attended law library, he returned to his cell and filed a grievance.  (Id.)

In May, plaintiff received an RVR issued by Cruz for "disrespect."  (Id. (citing ECF No. 17 at 143 (May 14, 2024 RVR).)  Plaintiff alleges the RVR is false, he did not disrespect Cruz, and the "circumstance of violation" portion of the RVR contains numerous false statements and embellishments, including that plaintiff flailed his arms and that Cruz blocked plaintiff's way to stop him from walking behind her.  (Id.)

Plaintiff states a potentially cognizable retaliation claim against defendant Cruz based on her issuance of a false RVR on May 14, 2024, against plaintiff based on his protected conduct.

1        G.  <u>Fourteenth Claim – Defendants Flores and Lee</u>

2          In his fourteenth claim, plaintiff alleges on July 8, 2024, after being delayed in the dining

3    hall, plaintiff reported to the gate for his transport to a medical appointment. (ECF No. 17 at 41.)

4    Defendant Flores asked plaintiff if he was ready for transport; plaintiff responded that he needed

5    to briefly return to his cell to take his antibiotics. (<u>Id.</u>) Flores pressured plaintiff not to return to

6    his cell, and if he did, it would be considered a refusal to attend medical. (<u>Id.</u>) Plaintiff

7    responded that he was not refusing medical, but had to return to his cell and if he was denied

8    medical, plaintiff would write Flores up and file suit against him, and the longer they spoke, the

9    longer it would take to get on with the transport. (<u>Id.</u>) Flores became more hostile but

10   "ultimately conceded" and plaintiff returned to his cell. (<u>Id.</u>) Plaintiff returned within minutes,

11   and defendant Lee had joined Flores. (<u>Id.</u>) They headed to receiving and release ("R&R"), and

12   were approached by a cart driving on the walkway. (<u>Id.</u> at 41-42.) Flores told plaintiff to step off

13   the walkway, which he did, and then Flores instructed plaintiff to walk to the fence, and after

14   plaintiff took a few steps, Flores barked "face the fence!" (<u>Id.</u> at 42.) Plaintiff's body was

15   already facing the fence, there was no alarm, no segregated prisoner under escort, and plaintiff

16   viewed Flores' actions as retaliation. (<u>Id.</u>) Plaintiff told Flores "I am writing you up stop talking

17   to me." (<u>Id.</u>) Flores became hostile and escalated the situation by arguing and defendant Lee

18   chimed in. (<u>Id.</u>) Flores informed plaintiff that he had to obey any order Flores "shouted." (<u>Id.</u>)

19   Plaintiff responded he would only obey lawful orders, and told Flores the medical appointment he

20   was to attend was for an issue resulting from multiple civil rights violations, was pending

21   litigation, and if Flores denied plaintiff his medical appointment, plaintiff would not hesitate to

22   make Flores a defendant. (<u>Id.</u>) Plaintiff alleges Flores and Lee continued to escalate the situation

23   with curse words, threats to deny plaintiff's medical appointment, and claimed plaintiff was

24   "displaying strange behavior," and "needs to see mental health!" (<u>Id.</u>) Plaintiff responded, "I am

25   done speaking to you, I am done standing in front of R&R, you're either taking me to my medical

26   appointment or I am going back to the cell to write you up." (<u>Id.</u> at 43.) Flores replied, "you're

27   not going to your appointment! Turn around and cuff up!" (<u>Id.</u>) Flores had no reason to restrain

28   plaintiff, so plaintiff, who feared for his safety, sat on the floor with his hands raised, palms

facing out, and requested a superior.  (Id.)  Plaintiff told Flores and Lee they had no grounds to restrain plaintiff, and he did not want them touching him.  (Id.)  Finally, they told plaintiff he could walk back to his cell on his own.  (Id.)  Plaintiff got up and started walking, while Flores followed plaintiff and made unprofessional comments to plaintiff.  Plaintiff claims he was denied his medical appointment in retaliation for his protected conduct.  (Id.)

Liberally construed, plaintiff states a potentially cognizable retaliation claim based on defendants Flores and Lee denying plaintiff access to his medical transport because of plaintiff's anticipated protected conduct.

### H.  Fifteenth Claim – Defendant Flores

In his fifteenth claim, plaintiff alleges in July 2024, he received an RVR issued by defendant Flores, who falsely claimed plaintiff engaged in "behavior which could lead to violence," and made numerous false statements concerning what took place on July 8, 2024. (ECF No. 17 at 44 (citing ECF No. 17 at 199).)  Plaintiff states a potentially cognizable retaliation claim against defendant Flores based on Flores' issuing a false RVR against plaintiff because of plaintiff's protected conduct.

### I.  Seventeenth Claim – Defendant Lt. Bordewick

In his seventeenth claim, plaintiff alleges on July 3, 2024, he was in a holding cell in the ASU waiting for transfer to B-yard, plaintiff witnessed Lt. Bordewick[6] speaking unprofessionally to prisoners in the surrounding holding cells, and saw an inmate restrained in handcuffs behind his back while in the holding cell.  (ECF No. 17 at 47.)  Plaintiff attempted to quietly obtain Bordewick's name and to document the conditions plaintiff was witnessing.  (Id.)  Bordewick noticed and said, "the name is Bordewick, and make sure you spell it right on the grievance!" (Id.)  Plaintiff responded that he would.  (Id.)  After that, Bordewick, who surprisingly knew plaintiff's name, became increasingly hostile, claiming he "did not fear prisoners who thought they knew the law" and called plaintiff a "snitch" in front of other prisoners multiple times."  (Id.

---

[6]  Plaintiff uses "Bordewick" and "Bodewick" interchangeably in this section.  (ECF No. 17 at 47-48.)  Because plaintiff identified defendant "Bordewick" as a defendant (id. at 15), the Court will use "Bordewick."

at 48.)  Plaintiff claims Bordewick said things like, "jail-house snitch!" and "yeah, you're going to be a snitch your whole term!," and made derogatory comments about plaintiff's housing, claiming "I bet you cell up with trannys!" and made other "false, hateful, disgusting, and homophobic comments."  (Id.)  Plaintiff alleges that by the time he arrived at B-yard, plaintiff was so upset by Bordewick's conduct that plaintiff had forgotten the name, so filed a grievance identifying the guard as a lieutenant whose name began with the letter "B."  (Id. (citing ECF No. 17 at 209 (grievance).)

Plaintiff's allegations state a potentially cognizable retaliation claim against defendant Bordewick who, in the context of this exchange, escalated the verbal abuse to call plaintiff a snitch in front of other inmates in retaliation for plaintiff's protected conduct.  Such an allegation is actionable.  Valandingham v. Bojorquez, 866 F.2d 1135, 1137-39 (9th Cir. 1988) (reversing grant of summary judgment where plaintiff alleged and supported with an affidavit that in retaliation for filing grievances the defendant correctional officers conspired to label him a "snitch" thereby subjecting him to threats of harm by other inmates); see also Gornick v. California Department of Corrections, 2008 WL 3941683, at *3 (E.D. Cal. Aug. 26, 2008) (acknowledging that the allegations in Valandingham involved action that were clearly adverse to plaintiff sufficient to constitute an actionable retaliation claim).

J.  Eighteenth Claim – Defendant Lt. Bordewick

In his eighteenth claim, plaintiff alleges on August 26, 2024, he was called for a hearing on RVR Log No. 7470187 issued by defendant Bell.  (ECF No. 17 at 49.)  Upon entry, plaintiff noticed it was Lt. Bordewick who was to hold the hearing.  (Id.)  Plaintiff immediately told Lt. Bordewick to

> recuse yourself, get another prison guard to preside over this hearing. I will not receive a fair hearing from you, you are biased, you have already retaliated against me once and you will continue your retaliation against me.  The last interaction we had resulted in a grievance that went to internal affairs.

(Id.)  Lt. Bordewick laughed and refused to recuse himself.  (Id.)  Plaintiff claims Lt. Bordewick could have had Lt. Alardo hold the hearing as Lt. Alardo was only a few feet away.  (Id.)  Lt. Bordewick read out loud the "circumstances of violation" from the RVR, and when he was done,

16

1  plaintiff asked him if anything in there struck him as odd.  (Id.)  Lt. Bordewick smiled and said

2  the RVR was perfect.  (Id.)  Plaintiff laughed indignantly and said,

3          I told [defendant] Bell I would file a grievance on him for what I
        perceived to be misconduct, this is free speech and is protected by
4        the First Amendment.  The only reason [defendant] Bell wrote me up
        was because I told him I would file a grievance on his and I have
5        previously filed grievances on him and his fellow prison guards.

6  (Id. at 50)  Lt. Bordewick said, "I find you guilty!"  (Id.)  Plaintiff responded, "Of course you do,

7  but the hearing is not over yet."  (Id.)  Plaintiff sought the audio from the video footage that

8  plaintiff was earlier not provided, and requested it be presented as evidence because Bell claimed

9  plaintiff used free speech unlawfully.  (Id.)  Lt. Bordewick denied plaintiff access to the audio

10  portion of the video and refused to watch the video.  (Id.)  Despite Lt. Bordewick's attempt to

11  prematurely conclude the hearing, plaintiff told him plaintiff had multiple witnesses, the first was

12  defendant Bell, who was not present.  (Id.)  Lt. Bordewick attempted to reschedule, but plaintiff

13  refused to consent, noting the regulation says the reporting employee "shall" be made available

14  upon request.  (Id. at 51.)  "Produce the witness or drop the charge."  (Id.)  Lt. Bordewick ordered

15  prison guard Deuell to retrieve Lt. Lardo to assist, and Lardo called defendant Bell, who

16  answered the phone.  (Id.)  Lt. Bordewick deemed many of plaintiff's proposed questions to be

17  irrelevant, and plaintiff alleges that Lt. Bordewick did not take into consideration many of Bell's

18  answers.[7]  (Id.)  Lt. Bordewick deemed plaintiff's question "what is a special unlock" as

19  irrelevant, but plaintiff was able to have Bell explain that a "one-way" is "a decision for a prison

20  guard to allow a prisoner into his cell in-between a scheduled unlock."  (Id.)  When asked if one-

21  ways were common, Bell responded, "I don't control the doors."  (Id.)  Bell confirmed he was

22  aware that using the grievance process is protected by the First Amendment.  (Id.)  Lt. Bordewick

23  deemed plaintiff's follow-up questions irrelevant, except that Bell stated he obtained the info

24  about plaintiff's previous RVR from SOMS.  (Id. at 52-53.)  Plaintiff paused to review his

25  documents, and Lt. Bordewick barked, "we're done you're done!  You're guilty!"  (Id. at 53.)

26  Plaintiff objected that he had more questions and more witnesses, but Lt. Bordewick refused both.

27

28  [7]  Plaintiff alleges that Lt. Bordewick refused plaintiff his right to question Bell, but plaintiff then
goes on to relate the questions Bell was asked.  (ECF No. 17 at 51-52.)

Liberally construed, plaintiff's claim that Lt. Bordewick retaliated against plaintiff based on his protected conduct by finding plaintiff guilty of a false RVR states a potentially cognizable retaliation claim.

K.  Nineteenth Claim – Defendant Trevino

In his nineteenth claim, plaintiff alleges on August 26, 2024, plaintiff was called to the program office, but defendant Trevino denied plaintiff entry.  (ECF No. 17 at 54.)  Plaintiff told Trevino that plaintiff was called to the program office by the lieutenant, but Trevino told plaintiff he could not go into the program office.  (Id.)  Plaintiff responded, "fine, you tell the lieutenant you wouldn't allow me to speak to him."  (Id.)  As plaintiff walked away, Trevino laughed and cursed at plaintiff.  (Id.)  Plaintiff turned around and stopped a distance away from Trevino and said, "let me see your name guard, I'm writing you up."  (Id.)  Plaintiff obtained Trevino's name and walked away, at which point Trevino called plaintiff a "fucking piece of shit!"  (Id.)  Plaintiff returned toward Trevino and asked him who he was cursing at; Trevino took out his mace and started shaking it at plaintiff in a threatening manner.  (Id.)  Plaintiff and Trevino then had an "unpleasant exchange," lasting a few seconds, and then plaintiff walked away.  (Id. at 54-55.)  When plaintiff turned around Trevino hit the alarm and walked after plaintiff, who then sat on the ground.  (Id. at 55.)  Plaintiff alleges that Trevino continued being aggressive and escalated the situation.  (Id.)  Plaintiff told defendant Deuell not to touch plaintiff, and plaintiff would not speak to him, or go anywhere with Deuell as long as Trevino was near.  (Id.)  Deuell refused to ask Trevino to leave or de-escalate the situation.  (Id.)  Shortly after, Sgt. Scott walked over to plaintiff, who told Sgt. Scott that Trevino was escalating the situation, and "to order him to get away from me or I would not speak to [Sgt. Scott]."  (Id.)  Sgt. Scott ordered Trevino away and said they would speak in the program office.  (Id.)  Plaintiff told Sgt. Scott plaintiff felt unsafe going anywhere with him, and plaintiff wanted to remain on the yard around witnesses.  (Id.)  Sgt. Scott insisted plaintiff accompany him to the program office.  (Id.)  Plaintiff told Sgt. Scott there were people around who witnessed Trevino's misconduct, plaintiff had told Trevino that plaintiff would file a grievance on him, and Trevino continued his retaliatory conduct by cursing at plaintiff, threatening plaintiff with the use of chemicals, and hitting the alarm, and Trevino "is

18

1    going to consummate his retaliation with a falsified RVR," and plaintiff must be allowed to

2    gather witnesses.  (Id.)  Sgt. Scott assured plaintiff he would speak to Trevino, "and the situation

3    was not so serious as [plaintiff] was making it seem."  (Id. at 55-56.)  Deuell was with Sgt. Scott

4    when he would not let plaintiff speak to witnesses, yet Deuell said nothing.  (Id. at 56.)  Finally,

5    they took plaintiff to the lieutenant, who said he called plaintiff for a grievance.  (Id.)  Plaintiff

6    told the lieutenant about the incident with Trevino, that plaintiff is subject to this every time he

7    leaves his cell, and to never call plaintiff for anything except an RVR hearing.  (Id.)  Plaintiff

8    returned to his cell and wrote a grievance.  (Id.)

9        Liberally construed, plaintiff states a potentially cognizable retaliation claim against

10   defendant Trevino based on his threatening plaintiff with mace and sounding an alarm for no

11   legitimate correctional purpose after plaintiff threatened to write a grievance against Trevino.[8]

12       L.  Twentieth Claim – Defendant Trevino

13       In his twentieth claim, plaintiff alleges on September 2, 2024, plaintiff was served an

14   RVR issued by defendant Trevino based on the August 26, 2024 incident.  (Id. at 56.)  Plaintiff

15   alleges Trevino falsified many statements concerning what took place on August 26, 2024.  (Id.

16   (citing ECF No. 17 at 215 (RVR).)  Liberally construed, plaintiff alleges that Trevino wrote a

17   false RVR against plaintiff because plaintiff threatened to write Trevino up during the August 26,

18   2024 incident.  (Id. at 54.)  Plaintiff states a potentially cognizable retaliation claim against

19   defendant Trevino.

20       M.  Twenty-Second Claim – Defendant Stoer

21       In his twenty-second claim, plaintiff alleges on August 1, 2024, plaintiff filed a grievance

22   on defendant Babcock alleging he was too loud on the public announcement system, which could

23   cause damage to the human ear, and attached a petition signed by multiple inmates who supported

24   the grievance.  (ECF No. 17 at 59 (citing ECF No. 17 at 166-70).)  Most of the inmate signatures

25   _____

     [8]  However, as to defendants Deuell and Sgt. Scott, plaintiff fails to set forth any specific facts
26   that indicate either defendant acted with a retaliatory motive or in response to plaintiff's protected
     conduct.  But even if the actions or omissions of defendants Deuell and Sgt. Scott could be
27   construed as being taken in retaliation, plaintiff was merely delayed by them.  See Watison, 668
     F.3d at 1114.  Plaintiff fails to state cognizable retaliation claims against defendants Deuell and
28   Sgt. Scott.

were personally obtained by plaintiff, but a few of the signatures were obtained by other inmates. (Id.)  The petition stated, "I have read Adam Michael Kendall's grievance and agree with his analysis of prison guard Babcock's misconduct."  (Id.)  On September 13, 2024, plaintiff received an RVR for "falsification of a document" issued by defendant Stoer, who claimed that every inmate Stoer interviewed requested to have "their name removed" from the petition.  (Id. (citing ECF No. 17 at 220).)  Plaintiff alleges that Stoer made other false statements in the RVR.  (Id. at 60.)  Plaintiff was found not guilty of this RVR.  (Id. (citing ECF No. 17 at 269-77.)  Plaintiff alleges that Stoer issued the false RVR in retaliation for plaintiff's use of the prison grievance process, which states a potentially cognizable retaliation claim.

N.   Twenty-Third Claim – Defendant Andrade

In his twenty-third claim, plaintiff alleges on June 15, 2024, plaintiff approached the dining hall and guards Matson and Limon said, "good morning Kendall."  Defendant Andrade, a few feet away but within earshot, asked plaintiff for his identification ("ID").  (ECF No. 17 at 61.) Plaintiff told Andrade plaintiff did not have his ID, but Andrade knew who plaintiff was and his fellow guards had identified plaintiff.  (Id.)  Andrade responded that plaintiff would not eat until he got his ID.  (Id.)  As plaintiff walked away, Andrade and plaintiff exchanged words, and plaintiff "made clear [he] would be filing a grievance on [Andrade.]"  (Id.)  Plaintiff only made it a few feet back to his building when an alarm sounded; plaintiff took a seat on a bench during the code.  (Id.)  Andrade saw plaintiff, making eye contact multiple times, but said nothing.  (Id.) After the alarm concluded, plaintiff went to his cell and retrieved his ID.  (Id.)  Upon his return, Andrade would not allow plaintiff to enter the dining hall.  (Id. at 61-62.)  Plaintiff sat on a nearby picnic table in front of the dining hall with his feet on the bench and waited to be allowed into the dining hall.  (Id. at 62.)  Another alarm sounded, and plaintiff moved to sit on the bench of the table.  (Id.)  Andrade, with prison guard Vargas, approached plaintiff and "aggressively" told plaintiff to sit on the ground.  (Id.)  Plaintiff told Andrade that plaintiff was already in a seated and secure position, there was no emergency in the immediate vicinity, he would not follow a retaliatory order to sit on the floor, and that the only reason Andrade was telling plaintiff to sit on the floor was because plaintiff files grievances against him and his coworkers, and

Andrade knew plaintiff was going to file a grievance against Andrade.  (Id.)  Plaintiff began writing a grievance, and Andrade said, "you're going to see I write better than you!"  (Id.) Andrade asked plaintiff for his ID, and plaintiff responded that Andrade knew exactly who plaintiff was, plaintiff was done talking to him, and was not feeding into any more of his retaliation.  (Id.)  Andrade responded that he would put the yard down if plaintiff did not hand over the ID.  (Id.)  Plaintiff replied that not providing an ID was not a "yard downable event, and to get away from [plaintiff] because [he] felt uncomfortable."  (Id. at 62-63.)  Andrade hit the alarm and reported on his radio that plaintiff would not sit on the floor or give Andrade plaintiff's ID.  (Id.)  Andrade then turned to the group of prisoners waiting for medication and said, "alright everybody, your program is delayed because of Kendall here!"  (Id.)  Plaintiff replied, "did you really just attempt to incite violence between me and an entire group of prisoners?"  Plaintiff turned to the group of prisoners and yelled, "did everyone see this guard's retaliation, his deliberate attempt to incite violence between us?"  (Id.)  Prisoners in the group began yelling "yeah, we saw!" and "we were watching!"  (Id.)  Plaintiff turned to prison guard Vargas and asked him if he saw what just happened, and Vargas shook his head yes.  (Id.)

The mere threat of harm can be an adverse action.  See Watison, 668 F.3d at 1114 (internal citations omitted).  Liberally construed, plaintiff states a potentially cognizable retaliation claim against Andrade.

O.  Twenty-Fourth Claim – Defendant Sgt. Soriano

In his twenty-fourth claim, plaintiff alleges on July 30, 2024, tower guard Jammal opened plaintiff's cell door and said plaintiff was being called to the program office.  (ECF No. 17 at 67.) Plaintiff asked why, and defendant Jammal spoke to plaintiff "rudely."  (Id.)  Plaintiff asked Jammal to call the program office and find out why plaintiff was being called, but Jammal refused.  (Id.)  Plaintiff made clear to Jammal that plaintiff wanted to attend all RVR hearings but would not go the program office for any other reason.  (Id.)  A few minutes later, Jammal told plaintiff that he would receive thirty days loss of yard issued by Sgt. Soriano for refusing to attend an RVR hearing.  (Id.)  Plaintiff objected that he did not refuse to attend an RVR hearing and told Jammal to open the door so he could go speak to Sgt. Soriano.  (Id.)  At the program

1  office, Sgt. Soriano refused to give plaintiff a hearing because plaintiff earlier refused to attend.

2  (Id.)  Plaintiff objected, stating that if Sgt. Soriano looked at the video footage she would see that

3  plaintiff told Jammal plaintiff wanted to attend all RVR hearings.  (Id. at 67-68.)  Sgt. Soriano

4  still refused to provide plaintiff a hearing, and plaintiff informed her he would be filing suit

5  against her for her misconduct and walked away.  (Id. at 68.)  Sgt. Soriano yelled, "I'm putting

6  you on C-Status," which plaintiff alleges is a more severe penalty than the thirty day loss of yard

7  Jammal told plaintiff he would be receiving.  (Id.)

8        Sgt. Soriano's threat to place plaintiff on C-Status immediately after plaintiff stated he

9  would be suing her is sufficient to state a potentially cognizable retaliation claim.[9]

10        P.  Thirtieth Claim – Defendant Pendleton

11        In his thirtieth claim, plaintiff alleges that while plaintiff was housed in building 9, he told

12  defendant Pendleton and other prison guards that plaintiff had scalp issues requiring medication,

13  and if he showers at night, his long wet hair makes it difficult to sleep, and the moisture worsens

14  his scalp condition.  (ECF No. 17 at 83.)  Pendleton told plaintiff that other prison guards were

15  telling her not to permit plaintiff to shower, after which plaintiff began having problems with

16  Pendleton.  (Id.)  On September 11, 2024, plaintiff showered right after breakfast so he could

17  apply his medicine.  (Id.)  Transport arrived to take plaintiff to outside medical for his

18  dermatology appointment.  (Id.)  The next day, Pendleton approached plaintiff in the dayroom

19  and began harassing plaintiff about the shower he took the previous day.  (Id.)  Pendleton told

20  plaintiff he could not shower unless he asked her.  Plaintiff reiterated his scalp issues he had

21  earlier related to Pendleton, reminded her he showed her his medication, and was trying to get a

22  reasonable accommodation to apply the needed medication.  (Id. at 83-84 (citing ECF No. 17 at

23  244).)  Plaintiff alleges Pendleton "persisted."  (Id. at 84.)  Plaintiff told Pendleton she knew

24  plaintiff's scalp was bleeding and he was in pain because he previously told her that, and she and

25  _____

26  [9]  Plaintiff's allegations fail to state a retaliation claim against defendant Jammal.  Plaintiff admits
    he did not go to the program office when Jammal initially opened the cell door and told plaintiff

27  he had been called to the program office.  That Jammal refused to call the program office upon
    plaintiff's request is not in any way connected to plaintiff's protected conduct.  Similarly, Sgt.

28  Soriano's refusal to hold a hearing is not connected to plaintiff's protected conduct.

1    her fellow prison guards "were in Eighth Amendment territory" and if they continue to "block"

2    plaintiff from applying his medication they could face court action.  (Id.)  Pendleton said she was

3    writing plaintiff up for taking a shower on September 11, 2024.  (Id.)  Plaintiff responded by

4    stating he would file a grievance on her, and she would be making the list of MCSP guards

5    plaintiff was suing for retaliation.  (Id.)  After that, Pendleton wrote an RVR against plaintiff for

6    "unlawful influence."  (Id. (citing ECF No. 17 at 248).)  Subsequently, the RVR was dismissed

7    for failing to state unlawful influence, and plaintiff was found not guilty.  (Id. (citing ECF No. 17

8    at 259).)

9         Liberally construed, plaintiff states a potentially cognizable retaliation claim against

10   defendant Pendleton based on her filing an RVR against plaintiff in retaliation for his statement

11   he would file a grievance against her.

12   **VIII.   REMAINING RETALIATION CLAIMS ARE NOT COGNIZABLE**

13        The Court carefully reviewed all of plaintiff's claims.  Given the lengthy pleading (101

14   pages of pleading plus 151 pages of exhibits) alleging a myriad of unrelated claims against

15   dozens of different defendants, many of which do not state cognizable retaliation claims, and

16   because the non-cognizable claims share similar deficiencies, the Court will not separately

17   address each claim that fails to state a cognizable retaliation claim.  The Court provides the

18   following summary to provide notice to plaintiff of the deficiencies and assist him should he elect

19   to file an amended complaint or separate lawsuits to raise the unrelated, yet cognizable claims.

20        A.   Pleading Must Address Each Element of Retaliation Claim

21        Plaintiff's first claim (ECF No. 17 at 17) and many of his subsequent retaliation claims

22   fail to address each element of a retaliation cause of action, identified above.  Rather than simply

23   recounting what happened, plaintiff must plead facts which suggest an absence of legitimate

24   correctional goals for the challenged conduct, and plead facts showing that it was plaintiff's

25   exercise of his First Amendment rights that motivated the alleged adverse action.  Plaintiff must

26   allege either a chilling effect on future First Amendment activities, or that he suffered some other

27   harm that is "more than minimal."  Watison, 668 F.3d at 1114.  Indeed, in his first claim,

28   although plaintiff claims he was denied the guard's names, his grievance confirmed he correctly

1   identified both guards in his grievance.  (ECF No. 17 at 110.)

2       B.  Pleading Must Include Charging Allegations Against Each Defendant

3       The FAC includes claims that do not including any charging allegations as to a named

4   defendant for that claim, which is not sufficient to state a claim.  See Fed. R. Civ. P. 8.  For

5   example, in his twenty-fifth claim, plaintiff alleges retaliation and excessive force against

6   defendant Lambert (and others), but plaintiff included no charging allegations as to defendant

7   Lambert.  (ECF No. 17 at 69.)  Plaintiff thus fails to state a claim against Lambert.

8       C.  Pleading Must Allege Causal Connection between Retaliatory Motive and Adverse

9           Action

10      The FAC recounts incidents at many RVR hearings, but just because the alleged

11  violations took place at a disciplinary hearing, or adjudicated issues plaintiff contended were

12  based on his First Amendment activities, does not demonstrate that the actions or omissions of the

13  hearing officer were based on plaintiff's First Amendment activities.  For example, in plaintiff's

14  seventh claim against Lt. Fisk, plaintiff alleged the following:

15      On June 6, 2024, defendant Lt. Fisk held a hearing on Brazil's RVR issued about the April

16  16, 2024 incident, and refused to allow plaintiff to call witnesses or ask questions.  (ECF No. 17

17  at 27.)  Plaintiff states he told Lt. Fisk that Brazil's RVR was continued retaliation, which

18  plaintiff previously warned Lt. Fisk would happen absent intervention.  (Id.)  Plaintiff informed

19  Lt. Fisk that plaintiff had permission from building officers to obtain grievances from the

20  program office that day.  Plaintiff alleges the hearing was contentious, and multiple times while

21  plaintiff was advocating for himself and had broken no rules, Lt. Fisk threatened to kick plaintiff

22  out and hold the hearing without plaintiff.  (Id.)  In response to plaintiff's argument that he had

23  permission to be in the program office, Lt. Fisk informed plaintiff that Brazil had revoked

24  plaintiff's permission to be in the program office.  (Id. at 28.)  Plaintiff responded that Lt. Fisk

25  was "sanctioning the retaliation of prison guard Brazil" and plaintiff would take legal action

26  against Lt. Fisk if he "forced" plaintiff.  (Id.)  Lt. Fisk responded, "look, I'm all for you filing

27  grievances and asserting your rights through the grievance process."  (Id.)  Plaintiff replied, "I'm

28  not just going to file a grievance on you, you'll see a federal judge for this."  (Id.)  Lt. Fisk stood

24

1    up, said he had a pressing prison guard issue that required his presence and would reconvene the

2    following Tuesday.  (Id. at 28-29.)  Plaintiff was not called to meet with Lt. Fisk again.  (Id. at

3    29.)  Plaintiff was found not guilty of Brazil's RVR.  (Id. at 27.)

4         Plaintiff fails to allege facts demonstrating that on June 6, 2024, defendant Lt. Fisk took

5    some adverse action because of plaintiff's First Amendment activity.  Although plaintiff informed

6    Lt. Fisk during the hearing that plaintiff would file a grievance against Lt. Fisk, the Court cannot

7    construe Lt. Fisk's action of leaving the hearing for a "pressing prison guard issue" constitutes an

8    action adverse to plaintiff.  No other adverse action is identified.  Plaintiff fails to state a

9    retaliation claim against defendant Lt. Fisk.  See also ECF No. 17 at 21-22, 31, 39.

10        D.   Speculation Insufficient

11        Mere speculation that a defendant acted out of retaliation is insufficient.  See Wood v.

12   Yordy, 753 F.3d 899, 904-905 (9th Cir. 2014) ("We have repeatedly held that mere speculation

13   that defendants acted out of retaliation is not sufficient.").  Many of plaintiff's claims are based

14   on his speculation that the defendant was acting in retaliation.  For example, in his twenty-ninth

15   claim, plaintiff speculates that defendants Captain Stacy and Gibbs returned mail in retaliation.

16   (ECF No. 17 at 82.)  But plaintiff included no facts showing that either defendant acted with a

17   retaliatory motive or were even aware of plaintiff's protected conduct.

18        Plaintiff is required to allege facts demonstrating a retaliatory motive or facts from which

19   a retaliatory motive can be inferred.

20        E.   Delay Alone Insufficient Adverse Action

21        In his eleventh claim, plaintiff alleges that defendants Babcock, Bell and Nardi delayed

22   the processing of plaintiff's legal mail and his subsequent return to his cell.  (ECF No. 17 at 34-

23   36.)  However, plaintiff was ultimately allowed to mail his legal mail, and the delay was less than

24   a day.  Plaintiff's delay in his ability to enter his cell, while frustrating for plaintiff, was

25   inconsequential or de minimis and "is not actionable adverse action."  Watison, 668 F.3d at 1114.

26   Plaintiff fails to state cognizable retaliation claims against defendants Babcock, Bell and Nardi.

27        F.   Counseling Chronos Insufficient to State Retaliation Claim

28        Plaintiff's claims based on counseling chronos are not sufficient to state a retaliation

25

1    claim.  Courts within the Ninth Circuit have held that counseling only RVRs and custodial

2    counseling chronos (as they were previously called), do not amount to adverse actions.  See, e.g.,

3    Vallery v. Botkin, 2020 WL 7425343, at *4-5 (E.D. Cal. Dec. 18, 2020) ("Counseling Only Rules

4    Violation Report . . . is not an adverse action for plaintiff's retaliation claim."), findings and

5    recommendations adopted, 2021 WL 843614 (E.D. Cal. Mar. 5, 2021); Robinson v. Gen.

6    Manager of Calpia, 2022 WL 5052680, at *7 (C.D. Cal. Aug. 22, 2022), report and

7    recommendation adopted, 2022 WL 5081834 (C.D. Cal. Oct. 4, 2022) (counseling only RVRs

8    "do not amount to adverse actions"); Heilman v. Furster, 2018 WL 2588900, at *11 (C.D. Cal.

9    May 1, 2018) (collecting cases and finding the "lack of concrete harm -- whether threatened or

10   immediate -- undermines the allegation that the [Counseling] Chronos were adverse actions."),

11   findings and recommendations adopted, 2018 WL 2472891 (C.D. Cal. May 31, 2018).[10]

12        In his twelfth claim against defendant Babcock, plaintiff alleges as follows.  In July 2024,

13   plaintiff received a false RVR, Log No. 7464770, from Babcock, claiming that plaintiff suddenly,

14   without justification, began cursing at Babcock, despite acknowledging that plaintiff had

15   requested cell entry several times and Babcock refused to open the cell door.  (Id. at 37.)  Plaintiff

16   claims that Babcock filed this RVR because plaintiff filed a grievance on Babcock and his fellow

17   guards.  (Id.)

18        On July 19, 2024, plaintiff was sitting at a dayroom table when there was an alarm in a

19   different building.  Babcock announced over the loud speaker, "get down."  (Id.)  Plaintiff

20   remained sitting.  (Id.)  Defendant Nardi walked over and told plaintiff he needed to get on the

21   floor.  (Id.)  Plaintiff responded that he had an ongoing bacterial infection making it painful to sit

22   in certain positions so he would not sit on the floor.  (Id.)  Nardi responded, "okay, you're good"

23

24   _____

     [10]  The Court recognizes that some district courts have found certain counseling chronos

25   sufficient.  See, e.g., Clemente v. Stinson, 2022 WL 584210, at *4 (E.D. Cal. Feb. 25, 2022)
     (informational counseling chrono had "direct and harmful consequence" of denial of plaintiff's

26   application for single-cell status); Brown v. Chothia, 2021 WL 2913076, at *13 (E.D. Cal. July
     12, 2021) (rejecting proposition that "only formal discipline" from a counseling chrono may

27   constitute an adverse action), report and recommendation adopted, 2021 WL 4132341 (E.D. Cal.
     Sept. 10, 2021).  As described above, plaintiff's allegations based on counseling RVRs/ chronos

28   are insufficient and distinguishable from these cases.

1   and walked away.  (Id.)  Babcock said nothing further that day, but shortly after, plaintiff received

2   another RVR, Log No. 7472968, called a counseling chrono, issued by Babcock claiming plaintiff

3   disobeyed an order to get down.  (Id. (citing ECF No. 17 at 181 (July 19, 2024 RVR)).)  Babcock

4   recommended that plaintiff be considered a program failure and put on "C Status."  (Id.)  Plaintiff

5   objects that although the RVR was called a counseling chrono, Babcock made no attempt to

6   "counsel" plaintiff, and alleges Babcock "weaponized a counseling chrono in retaliation for

7   [plaintiff's] participation in protected conduct – filing grievances and saying [he] would file

8   grievances."  (Id. at 38.)

9        Here, though plaintiff attempts to avoid the counseling chrono characterization by

10   claiming defendant "weaponized" the RVR, plaintiff identifies no disciplinary effect resulting

11   from the counseling only RVR.  The reasoning of the district courts finding counseling chronos

12   not to be adverse actions, set forth above, applies equally to plaintiff's claim.  In the instant case,

13   the counseling only RVR issued to plaintiff was informational only with no alleged disciplinary

14   effect.  Thus, the counseling only RVR does not constitute an adverse action.  Based on these

15   circumstances, it is not likely that issuance of the counseling only RVR would chill First

16   Amendment activities.  Further, the FAC itself alleges that plaintiff did not follow an order during

17   an alarm.  Ordering inmates to prone out during an alarm is a legitimate penological purpose.

18   Plaintiff failed to state a cognizable retaliation claim against defendant Babcock.

19        G.  Systemic Retaliation

20        Because plaintiff alleges "systemic retaliation" in connection with most of his unrelated

21   claims, the Court carefully reviewed every alleged retaliation claim to determine whether plaintiff

22   could state a viable claim under a systemic retaliation theory.  Overall, viewing plaintiff's FAC as

23   a whole, the Court cannot find that plaintiff can state a broad "systemic retaliation" claim.  Even

24   when construing the voluminous FAC liberally given plaintiff's pro se status, most of the

25   retaliation causes of action alleged fail to state a cognizable retaliation claim, there was little

26   overlap among the 41 defendants named, and the timing alone rarely suggested a retaliatory

27   motive.  The FAC also alleges that some of the incidents alleged involved plaintiff's own refusal

28   to follow orders, including during alarms at the prison.  While plaintiff is entitled to pursue First

1    Amendment activities, he is also required to follow lawful orders by correctional officers, even if

2    plaintiff disagrees with them.  The FAC also alleges repeated demands by plaintiff to speak to a

3    superior officer, that correctional officers do something at plaintiff's request or demand, and

4    questioning correctional officers' orders, which are not constitutionally protected activities.

5    Courts have found that verbal challenges to prison officials that are argumentative and

6    confrontational are not protected by the First Amendment.  See Johnson v. Carroll, 2012 WL

7    2069561 at *33-34 (E.D. Cal. June 7, 2012) (citing cases).  The Court finds that plaintiff fails to

8    state a cognizable systemic retaliation claim based on the FAC as a whole, as well as based solely

9    on those allegations that support potentially cognizable retaliation claims.

10        H.  Conclusion

11        In his second amended complaint, plaintiff should not renew retaliation claims unless they

12   are based on incidents where the Court found plaintiff stated a potentially cognizable retaliation

13   claim identified in Section VII above.

14   **IX.    OTHER COGNIZABLE CONSTITUTIONAL CLAIMS:  EXCESSIVE FORCE**

15   **AND FOURTH AMENDMENT SEARCH**

16        A.  Excessive Force Standards

17        "In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places

18   restraints on prison officials, who may not . . . use excessive physical force against prisoners."

19   Farmer v. Brennan, 511 U.S. 825, 832 (1994).  "[W]henever prison officials stand accused of

20   using excessive physical force in violation of the [Eighth Amendment], the core judicial inquiry

21   is. . . whether force was applied in a good-faith effort to maintain or restore discipline, or

22   maliciously and sadistically to cause harm."  Hudson v. McMillian, 503 U.S. 1, 6-7 (1992).

23   When determining whether the force was excessive, the court looks to the "extent of injury

24   suffered by an inmate. . . the need for application of force, the relationship between that need and

25   the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any

26   efforts made to temper the severity of a forceful response.' "  Hudson, 503 U.S. at 7 (quoting

27   Whitley v. Albers, 475 U.S. 312, 321 (1986)).  While de minimis uses of physical force generally

28   do not implicate the Eighth Amendment, significant injury need not be evident in the context of

1    an excessive force claim, because "[w]hen prison officials maliciously and sadistically use force

2    to cause harm, contemporary standards of decency always are violated."  Hudson, 503 U.S. at 9.

3              B.  Twenty-Fifth Claim – Defendants Prison Guards Sgt. Perez, Perez, Brazil, and

4                  Beckham and Multiple Unknown Defendants  – Excessive Force

5              In his twenty-fifth claim, plaintiff alleges excessive force as to defendants Sgt. Perez,

6    prison guard Perez, Brazil and Beckham, as well as other unknown prison guards.[11]  (ECF No. 17

7    at 69.)  Plaintiff alleges on the morning of September 23, 2024, plaintiff heard his cellmate

8    speaking to other inmates attempting to incite violence by paying prisoners to attack plaintiff, and

9    after yard release he heard other inmates making threats toward plaintiff.  (ECF No. 17 at 69.)

10   Plaintiff told prison guard Aguilar about the threats and requested to be removed from the yard.

11   (Id.)  Aguilar called other guards, and plaintiff was escorted to the program office and put in a

12   holding cell.  (Id.)  Shortly after, plaintiff was escorted to the program office to speak with prison

13   guard Sgt. Perez.  (Id.)  Plaintiff alleges defendant prison guard Perez was "immediately hostile"

14   and "spoke aggressively" at plaintiff.[12]  (Id.)  Plaintiff told prison guard Perez that plaintiff

15   overheard inmates threatening plaintiff, and at least one threatened to stab plaintiff.  (Id. at 69-

16   70.)  Plaintiff asked prison guard Perez to watch the video and listen to the audio, telling him a

17   short investigation would show plaintiff's safety was in jeopardy.  (Id. at 70.)  Prison guard Perez

18   refused to watch the video or investigate, but instead told plaintiff to go back to the yard and

19   conduct his own investigation.  (Id.)  Plaintiff asked prison guard Perez to put plaintiff in ASU

20   pending investigation, but Perez refused.  (Id.)  Plaintiff told prison guard Perez that plaintiff

21   could not go back to the yard and would not go back to participate in the violence that Perez was

22   sanctioning.  (Id.)  Prison guard Perez responded, "fine!  Stand here all day, I don't care!"  (Id.)

23   While waiting, plaintiff heard multiple prison guards, including Aguilera, Mott and others,

24   _____

25   [11]   As described above, this claim was also alleged against defendant Lambert, but no charging
     allegations against Lambert were made.  Therefore, plaintiff fails to state a claim against Lambert.
26   [12]   The Court identifies each Perez defendant just as plaintiff did in his first amended complaint.
     If plaintiff does not know the initials of their first names, when plaintiff files another pleading
27   raising this claim, he should identify the first prison guard Perez as Sgt. Perez (if that is accurate)
     rather than simply "prison guard," or may wish to add an identifying character to distinguish
28   between the two Perez defendants, for example, Perez-A and Perez-B.

mocking plaintiff, making jokes and laughing about plaintiff's safety being in jeopardy. (Id.)

Around 1:00 p.m. there was a code, and the alarm sounded. (Id.) Prison guard Perez told plaintiff to take a seat on the floor, after which other prison guards surrounded plaintiff. (Id.) Prison guard Perez barked "go wait outside!" (Id.) Plaintiff told prison guard Perez that he would not go wait outside because of his safety concerns. (Id.) Without warning, prison guard Perez reached down, grabbed plaintiff's arm and tried to drag plaintiff across the program office floor. (Id.) Plaintiff gently pulled back his arm and told prison guard Perez he did not have authority to put his hands on plaintiff, and that regulations require verbal persuasion before force is used. (Id. at 70-71.) Without warning, another prison guard, also named Perez, reached down and grabbed plaintiff's arm tight. (Id. at 71.) Plaintiff felt pain as prison guard Perez yanked plaintiff's arm and tried to drag plaintiff across the program office floor. (Id.) Plaintiff also felt pain when he snatched his arm from the grip of prison guard Perez, and told Perez "you cannot just assault me like that, do not touch me again." (Id.) Prison guard Perez paused a moment, and no guard attempted to de-escalate the situation. (Id.) Then, without warning, prison guard Perez reached down again more aggressively, viciously grabbed plaintiff's arm, and tried to drag plaintiff across the program office floor. (Id.) Feeling pain, plaintiff hit prison guard Perez in the chest as plaintiff pulled his arm back to get him to release plaintiff and stop the pain. (Id.) After plaintiff got his arm back, he made no other threatening motion, and was in a seated position on the floor. (Id.) At that time, five prison guards, starting with the two Perez's, surrounded plaintiff and began punching plaintiff in the face. (Id.) Plaintiff feared for his life and began fighting back. (Id. at 72.) Plaintiff was forced onto his stomach as guards sat on his back forcing air from plaintiff's lungs. (Id.) Defendant Brazil put cuffs tightly on plaintiff's legs, cutting off circulation and causing pain. (Id.) Another guard, or perhaps Brazil, put cuffs tightly on plaintiff's wrists, and then sat on them cutting off circulation and causing pain. (Id.) Even after being fully restrained, the guards continued to sit on plaintiff's back forcing air from his lungs. (Id.) Plaintiff told the guards he couldn't breathe, but defendants Beckham, Brazil and others made jokes, laughed, and made comments like 'you're talking just fine!" Plaintiff replied that his hands and legs were restrained, "remove me from the prone position, I can't breathe!" (Id. at 72-

30

73.) Beckham, Brazil and other guards laughed some more, and remarked if plaintiff "was talking [he] was breathing." (Id. at 73.) Plaintiff screamed "I can't breathe, I can't breathe," until he had no more air, hoping that the camera in the hall would catch the audio. (Id.) Only once plaintiff's breathing was dangerously labored did the guards remove plaintiff from the prone position and put him on his side. (Id.) Plaintiff requested his vital signs be checked, but guards refused. Eventually, plaintiff was able to sit up, and Beckham, Brazil and other guards refused to put plaintiff in a holding cell and remove his restraints. (Id.) Plaintiff alleges that to relieve the pain, he moved his hands from behind his back to the front of his body while still restrained, but remained sitting peacefully on the floor. (Id. at 73-74.) Beckham and other guards became hostile. (Id. at 74.) Plaintiff told Beckam and the other guards plaintiff was sitting peacefully and would go where they asked, but he could not sit with his arms restrained behind his back because he was in pain. (Id.) Plaintiff alleges the guards attacked him again, putting plaintiff on his stomach with Beckham saying, "stop resisting!" even though plaintiff was not. (Id.) The guards refused to return plaintiff to his side, and plaintiff again had difficulty breathing. Beckham was pushing plaintiff's body into the ground, compounding plaintiff's difficulty in breathing. (Id.) Plaintiff was partially placed on his side such that he could take in some air, but it was "torture." (Id.) After plaintiff struggled to breathe a long while, Beckham told plaintiff they were going to ASU. (Id.) Plaintiff responded that he needed his glasses and tablet. (Id.) Beckham and the other guards refused to retrieve them, even though they were only a few feet away. (Id. at 75.) Beckham and the other guards told plaintiff to stand. (Id.) Plaintiff told Beckham and the others that plaintiff would go with them willingly if they would grab his glasses and tablet, but he would not stand up without them. (Id.) Beckham and the other guards picked plaintiff up, took a photo of him, and dragged plaintiff outside. (Id.)

Plaintiff states potentially cognizable Eighth Amendment claims against defendants Sgt. Perez, prison guard Perez, Brazil and Beckham for the alleged use of excessive force; their comments during the use of force raises an inference that they used excessive force maliciously

///

///

31

1    and sadistically to cause plaintiff pain.[13]

2        C.    Twenty-Fifth Claim – Defendants Beckham, Rowe and Reynolds – Excessive Force

3        In his twenty-fifth claim, plaintiff alleges that once plaintiff was dragged outside the

4    program office, plaintiff was "thrown on a golf cart and forced to lay down. (ECF No. 17 at 75.)

5    Defendants Beckham and Rowe strapped plaintiff's chest to the cart. (Id.) As Rowe was

6    strapping plaintiff legs, plaintiff was in pain and moved to avoid the strap; Beckham and the other

7    guards attacked plaintiff again. (Id. at 75-76.) Despite being in leg restraints, Rowe bent

8    plaintiff's knee back in an unnatural way so that plaintiff thought his leg might snap. (Id. at 76.)

9    Plaintiff screamed, in excruciating pain, but Rowe continued bending plaintiff's knee. (Id.)

10    Beckham began saying, "you're not going to spit on me!" even though plaintiff never spat on

11    Beckham, and the guards attacked plaintiff again. (Id.) Beckham and Reynolds forced plaintiff's

12    head into the golf cart, straining and tearing plaintiff's neck muscles. (Id.) When the cart pulled

13    outside the gate heading toward the ASU, Rowe moved closer to plaintiff and said, "I'm going to

14    fucking kill you! You hear me! I said I'm going to fucking kill you! When we get to ASU I'm

15    going to break your fucking leg!" (Id.) Plaintiff called Rowe a coward and plaintiff said he

16    would tell the federal judge exactly what Rowe said. (Id.) Rowe responded, "I don't fucking

17    care!" (Id.) Defendant Reynolds said, "what can you say, we didn't hear anything!" (Id.)

18    Plaintiff alleges Beckham concurred. (Id.)

19        Plaintiff states cognizable Eighth Amendment excessive force claims against defendants

20    Beckham, Rowe and Reynolds; their comments raise an inference of their malicious and sadistic

21    intent to use excessive force to cause plaintiff pain.[14]

---

22    [13]  The FAC also alleges a retaliation claim against these defendants. While plaintiff claims Sgt.
23    Perez was immediately hostile and spoke aggressively to plaintiff, plaintiff includes no facts
      showing that such hostility was connected to plaintiff's First Amendment activity. Plaintiff
24    alleges no facts demonstrating that any of these named defendants were aware of plaintiff's First
      Amendment activities, and sets forth no statements any of them made that would suggest a
25    retaliatory motive. Thus, plaintiff fails to state cognizable retaliation claims against defendants
26    Sgt. Perez, prison guard Perez, Brazil and Beckham.

27    [14]  Plaintiff again fails to allege any facts connecting these events to plaintiff's First Amendment
      conduct, and therefore fails to state cognizable retaliation claims against defendants Beckham,
28    Rowe and Reynolds.

1
2

    D.  <u>Twenty-Fifth Claim – Defendants Beckham, Rowe, Reynolds and Unknown Prison</u>

        <u>Guards – Fourth Amendment Unreasonable Strip Search and Excessive Force</u>

3        In his twenty-fifth claim, plaintiff further alleges that upon arrival at ASU, defendants

4  Beckham, Rowe and Reynolds and other prison guards carried plaintiff into the ASU.  (ECF No.

5  17 at 77.)  Plaintiff had pain in his shoulders, wrist and ankles.  (<u>Id.</u>)  Plaintiff alleges he was

6  thrown in front of the cell, and all of his clothes were cut off, leaving him naked in front of the

7  cell.  (<u>Id.</u>)  Beckham and the guards put a triangular piece of metal on plaintiff's wrist, and he was

8  thrown in the cell.  Once the metal piece was removed, plaintiff was left naked in the cell.  (<u>Id.</u>)

9  Plaintiff requested clothes to no avail.  (<u>Id.</u>)  Plaintiff was told by an unidentified guard that

10  plaintiff would not be given clothes because Beckham ordered ASU guards to not provide clothes

11  to plaintiff.  (<u>Id.</u>)  Plaintiff claims the clothes that were cut off were never searched and remained

12  in front of the cell for days.  (<u>Id.</u>)

13            a.  <u>Fourth Amendment Search</u>

14        The Court first addresses plaintiff's Fourth Amendment claim.  <u>Turner v. Safley</u>, 482 U.S.

15  78, 89 (1987), provides the standard for reviewing alleged infringements of prisoners'

16  constitutional rights.  <u>See also</u> <u>Washington v. Harper</u>, 494 U.S. 210, 224 (1990) (stating that

17  <u>Turner</u> applies whenever "the needs of prison administration implicate constitutional rights");

18  <u>Michenfelder v. Sumner</u>, 860 F.2d 328, 331 (9th Cir. 1988) (applying the <u>Turner</u> standard to

19  prisoners' allegations of Fourth Amendment violations).  <u>Turner</u> provides that "when a prison

20  regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably

21  related to legitimate penological interests."  <u>Turner</u>, 482 U.S. at 89.

22        Searches of prisoners must be reasonable to be constitutional.  <u>See</u> <u>Michenfelder</u>, 860 F.2d

23  at 332.  The reasonableness of a particular search of a prisoner is determined by applying the

24  balancing test the Supreme Court announced in <u>Bell v. Wolfish</u>, 441 U.S. 520, 559 (1979) in

25  which the high court wrote:

26
27
28

        The test of reasonableness under the Fourth Amendment is not
        capable of precise definition or mechanical application.  In each case
        it requires a balancing of the need for the particular search against
        the invasion of personal rights that the search entails.  Courts must
        consider the scope of the particular intrusion, the manner in which it

1    is conducted, the justification for initiating it, and the place in which
2    it is conducted.

3    Bell, 441 U.S. at 559.  In Fourth Amendment cases, "[a]n action is 'reasonable' . . . regardless of

4    the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify

5    [the] action.'"  Brigham City, Utah v. Stuart, 547 U.S. 398, 404, (2006) (quoting Scott v. United

6    States, 436 U.S. 128, 138 (1978)); see also Nunez v. Duncan, 591 F.3d 1217, 1228 (9th Cir.

7    2010).  Thus, defendants' subjective intent is irrelevant, but that does not end the Court's inquiry.

8    See Nunez, 591 F.3d at 1228.  The issue is whether the search was "excessive, vindictive,

9    harassing, and unrelated to any legitimate penological interest."  See Michenfelder, 860 F.2d at

10    332.

11        Here, liberally construed, it appears plaintiff may be able to state a Fourth Amendment

12    claim against the defendants who stripped plaintiff naked where it is alleged that plaintiff was

13    brought to the ASU from the program office in full restraints and the guards did not search the

14    clothing stripped off of plaintiff; and where there was no allegation that plaintiff was hiding a

15    weapon or was suicidal.

16            b.    Excessive Force

17        Plaintiff's allegations also state an Eighth Amendment excessive force claim against

18    defendants Beckham, Rowe and Reynolds.[15]

19    **X.    OTHER NON-COGNIZABLE CONSTITUTIONAL CLAIMS**

20        A.    Twenty-Sixth Claim – Defendant Warden Patrick Covello – Eighth Amendment

21            Deliberate Indifference and Retaliation

22        In his twenty-sixth claim, plaintiff alleges on October 1, 2024, plaintiff was called to

23    committee in ASU.  (ECF No. 17 at 78.)  Defendant Covello told plaintiff he was being charged

24    with battery on a peace officer and the RVR was being referred to the district attorney for

25    prosecution.  (Id.)  Plaintiff asked, "How do you watch that video, and decide to charge me with

26    _____

27    [15]  Plaintiff also alleged these acts constituted retaliation, but plaintiff again failed to provide any
    facts demonstrating a causal connection between the actions of defendants Beckham, Rowe and
28    Reynolds and plaintiff's protected conduct, and therefore plaintiff fails to state cognizable
    retaliation claims against them.

1   anything?  Your guards put their hands on me absent any verbal persuasion and refused to remove

2   me from a dangerous situation when I told them I had safety concerns.  Your guards violated

3   policy, and the refusal to remove me from the prone position, while my hands and legs are

4   restrained, and I was screaming I can't breathe."  (Id.)  Plaintiff alleges Warden Covello had a

5   nervous look on his face and refused to answer plaintiff's questions.  (Id.)  All of plaintiff's

6   privileges were taken, and he was remanded to ASU.  (Id. (citing ECF No. 17 at 279 (Sept. 23,

7   2024 RVR)).)

8          In connection with Warden Covello, plaintiff alleges retaliation and Eighth Amendment

9   "deliberate indifference."  (Id. at 78.)  Warden Covello's guilty finding, standing alone, is

10  insufficient to state a retaliation claim.  Plaintiff identifies no facts showing a retaliatory motive,

11  and fails to explain how these allegations demonstrate deliberate indifference on the part of

12  Warden Covello.  Plaintiff fails to state a cognizable retaliation claim against Warden Covello.

13         B.   Thirty-First Claim – Defendant Jeff Macomber – Deliberate Indifference and

14              Systemic Retaliation

15         In his last claim, plaintiff alleges that defendant Jeff Macomber, Secretary of the CDCR,

16  and "responsible parties of the Office of the Inspector General" were deliberately indifferent and

17  engaged in systemic retaliation.  (ECF No. 17 at 85.)  Plaintiff alleges that in September, his

18  mother contacted Jeff Macomber and the office of the inspector general.  (ECF No. 17 at 85

19  (citing ECF No. 17 at 253).)  Plaintiff alleges that both Macomber and the office of the inspector

20  general were put on notice of the retaliation and the assault at MCSP but refused to intervene.

21  (Id. at 85 (citing ECF No. 17 at 255).)  Plaintiff alleges that the office of the inspector general and

22  the secretary of the CDCR are "enablers of prisons like MCSP," and that prison guards at MCSP

23  are "able to commit misconduct carefree" because the office of the inspector general and the

24  CDCR secretary are deliberately indifferent.  (Id. at 85.)

25         An individual defendant is not liable on a civil rights claim unless the facts establish the

26  defendant's personal involvement in the constitutional deprivation or a causal connection between

27  the defendant's wrongful conduct and the alleged constitutional deprivation.  See Hansen v.

28  Black, 885 F.2d 642, 646 (9th Cir. 1989); Johnson v. Duffy, 588 F.2d 740, 743-44 (9th Cir.

1  1978).  That is, plaintiff may not sue any official on the theory that the official is liable for the

2  unconstitutional conduct of his or her subordinates.  Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).

3  The requisite causal connection between a supervisor's wrongful conduct and the violation of the

4  prisoner's constitutional rights can be established in a number of ways, including by

5  demonstrating that a supervisor's own culpable action or inaction was a cause of plaintiff's injury.

6  Starr v. Baca, 652 F.3d 1202, 1208 (9th Cir. 2011).

7       Ms. Kendall's letter to defendant Macomber does not bear a date, but because she

8  references the attack on plaintiff in the program office, which occurred on September 23, 2024,

9  her letter must have been written on that date or later, depending on when plaintiff contacted her.

10  (Id.)  Therefore, by then, there was nothing Macomber could do to intervene in the incidents that

11  had already taken place before the letter was received.  Because plaintiff alleges no facts

12  demonstrating that Macomber was aware of the previous alleged retaliatory acts, his failure to act

13  after Macomber received Ms. Kendall's letter is insufficient to state a deliberate indifference or

14  retaliation claim.

15       Similarly, plaintiff does not indicate when in September Ms. Kendall notified the office of

16  the inspector general.  On September 30, 2024, the office responded to Ms. Kendall by email,

17  noting they had received her letter, and subsequently spoke with her by phone on September 30,

18  2024.  (ECF No. 17 at 255.)  These dates suggest that the alleged retaliatory acts had already

19  taken place by the time Ms. Kendall notified the office of the inspector general.  Further, by

20  October 18, 2024, the office of the inspector general had concluded its investigation, and

21  informed Ms. Kendall that "no intervention is warranted by our office at this time."  (Id. at 256.)

22  Although plaintiff claims the office of the inspector general "refused to intervene," the document

23  provided by plaintiff demonstrates that the office investigated Ms. Kendall's claims.  (Id. at 256.)

24  Absent facts not alleged here, the office's determination that no intervention was warranted does

25  not demonstrate the office's deliberate indifference or retaliation.

26       Plaintiff fails to state cognizable civil rights claims against defendant Macomber and the

27  "responsible parties" of the office of the inspector general.

28  ///

1    **XI.    STATE LAW CLAIMS**

2        As noted above, plaintiff alleges state law claims including violation of California Civil

3    Code § 1572, "assault and battery," and "deprivation of property." (ECF No. 17 at 14.)

4        Although the court may exercise supplemental jurisdiction over state law claims, plaintiffs

5    must first have a cognizable claim for relief under federal law. <u>See</u> 28 U.S.C. § 1367. Moreover,

6    if a plaintiff pursues state law claims, the plaintiff must clearly identify each claim and

7    demonstrate compliance with the California Government Claims Act[16] as to each claim. Cal.

8    Gov't Code § 810 <u>et seq.</u>

9        Under the California Government Claims Act, set forth in California Government Code

10   sections 810 et seq., a plaintiff may not bring a suit for monetary damages against a public

11   employee or entity unless the plaintiff first presented the claim to the California Victim

12   Compensation and Government Claims Board ("Board"), and the Board acted on the claim, or the

13   time for doing so expired. Compliance with this "claim presentation requirement" constitutes an

14   element of a cause of action for damages against a public entity or official. <u>State v. Superior</u>

15   <u>Court (Bodde)</u>, 32 Cal. 4th 1234, 1244 (2004). Thus, timely presentation of a claim under the

16   Government Claims Act is an element of the cause of action and must be pled in the complaint.

17   <u>Id.</u> at 1237, 1240; <u>see also</u> <u>Mangold v. Cal. Pub. Utils. Comm'n</u>, 67 F.3d 1470, 1477 (9th Cir.

18   1995). The plaintiff must present facts demonstrating compliance, rather than simply conclusions

19   suggesting as much. <u>Shirk v. Vista Unified School Dist.</u>, 42 Cal. 4th 201, 209 (2007), <u>as</u>

20   <u>modified</u> (Oct. 10, 2007). Such requirements also apply to state law claims included in a federal

21   action under § 1983. <u>See</u> <u>Volis v. Housing Auth. of the City of L.A. Emps.</u>, 670 F. App'x 543,

22   544 (9th Cir. 2016).

23       To be timely, a claim must be presented to the Board "not later than six months after the

24   accrual of the cause of action." Cal. Govt. Code § 911.2. Thereafter, "any suit brought against a

25   public entity" must be commenced no more than six months after the public entity rejects the

26

27   _____

[16] Formerly known as the California Tort Claims Act. <u>City of Stockton v. Superior Court</u>, 42
28   Cal.4th 730, 741-42, 68 Cal.Rptr.3d 295, 171 P.3d 20 (Cal. 2007) (adopting the practice of using
     Government Claims Act rather than California Tort Claims Act).

claim.  Cal. Govt. Code, § 945.6, subd. (a)(1).  Federal courts must require compliance with the California Government Claims Act for pendant state law claims that seek damages against state employees or entities.  Willis v. Reddin, 418 F.2d 702, 704 (9th Cir. 1969); Mangold, 67 F.3d at 1477.  State tort claims included in a federal action, filed pursuant to 42 U.S.C. § 1983, may proceed only if the claims were presented in compliance with the applicable exhaustion requirements.  Karim-Panahi v. Los Angeles Police Department, 839 F.2d 621, 627 (9th Cir. 1988); Butler v. Los Angeles County, 617 F. Supp. 2d 994, 1001 (C.D. Cal. 2008).

Here, plaintiff's FAC includes no allegations concerning compliance with the California Government Claims Act.  Therefore, plaintiff's state law claims are dismissed without prejudice.

## XII.  EXHIBITS

Plaintiff submitted 177 pages of exhibits to his FAC (ECF No. 17 at 108-285), even more exhibits than he appended to his original complaint (ECF No. 1 at 113-253).  While exhibits are permissible, Fed. R. Civ. P. 10(c), they are not necessary in the federal system of notice pleading, Fed. R. Civ. P. 8(a).  Plaintiff is advised that it is not the duty of the court to look through all of his exhibits to determine whether or not he has claims cognizable under § 1983.  Rather, the court looks to the factual allegations contained in the FAC to determine whether or not plaintiff has stated a cognizable claim for relief under § 1983.  Exhibits should not be submitted where (1) they serve only to confuse the record and burden the court, or (2) they are intended as future evidence.  If this action reaches a juncture at which the submission of evidence is appropriate and necessary (e.g., summary judgment or trial), plaintiff will have the opportunity at that time to submit his evidence to the court.

## XIII.  LEAVE TO AMEND

If plaintiff chooses to amend, plaintiff must demonstrate how the conditions about which he complains resulted in a deprivation of plaintiff's constitutional rights.  See e.g., West v. Atkins, 487 U.S. 42, 48 (1988).  Also, the second amended complaint must allege in specific terms how each named defendant is involved.  Rizzo v. Goode, 423 U.S. 362, 371 (1976).  There can be no liability under 42 U.S.C. § 1983 unless there is some affirmative link or connection between a defendant's actions and the claimed deprivation.  Id.; May v. Enomoto, 633 F.2d 164,

1    167 (9th Cir. 1980).[17]  Furthermore, vague and conclusory allegations of official participation in

2    civil rights violations are not sufficient.  Ivey v. Bd. of Regents, 673 F.2d 266, 268 (9th Cir.

3    1982).

4          In addition, plaintiff is informed that the court cannot refer to a prior pleading in order to

5    make plaintiff's second amended complaint complete.  Local Rule 220 requires that an amended

6    complaint be complete in itself without reference to any prior pleading.  This requirement exists

7    because, as a general rule, an amended complaint supersedes the original complaint.  See Ramirez

8    v. County of San Bernardino, 806 F.3d 1002, 1008 (9th Cir. 2015) ("an 'amended complaint

9    supersedes the original, the latter being treated thereafter as non-existent.'" (internal citation

10   omitted)).  Once plaintiff files a second amended complaint, the original pleading no longer

11   serves any function in the case.  Therefore, in a second amended complaint, as in an original

12   complaint, each claim and the involvement of each defendant must be sufficiently alleged.

13         Also, the federal rules contemplate brevity.  See Galbraith v. County of Santa Clara, 307

14   F.3d 1119, 1125 (9th Cir. 2002) (noting that "nearly all of the circuits have now disapproved any

15   heightened pleading standard in cases other than those governed by Rule 9(b)."); Fed. R. Civ. P.

16   84; cf. Rule 9(b) (setting forth rare exceptions to simplified pleading).  Plaintiff's claims must be

17   set forth in short and plain terms, simply, concisely and directly.  See Swierkiewicz v. Sorema

18   N.A., 534 U.S. 506, 514 (2002) ("Rule 8(a) is the starting point of a simplified pleading system,

19   which was adopted to focus litigation on the merits of a claim."); Fed. R. Civ. P. 8.  Plaintiff must

20   eliminate from plaintiff's pleading all preambles, introductions, argument, speeches,

21   explanations, stories, griping, evidence, summaries, and the like.  McHenry v. Renne, 84 F.3d

22   1172, 1180 (9th Cir. 1996) (affirming dismissal of § 1983 complaint for violation of Rule 8 after

23

---

24   [17]  Further, claims must be properly joined.  A plaintiff may properly assert multiple claims
     against a single defendant.  Fed. Rule Civ. P. 18.  In addition, a plaintiff may join multiple
25   defendants in one action where "any right to relief is asserted against them jointly, severally, or in
     the alternative with respect to or arising out of the same transaction, occurrence, or series of
26   transactions and occurrences" and "any question of law or fact common to all defendants will
     arise in the action."  Fed. R. Civ. P. 20(a)(2).  Unrelated claims against different defendants must
27   be pursued in separate lawsuits.  See George, 507 F.3d at 607.  This rule is intended, in part, "to
     prevent the sort of morass [a multiple claim, multiple defendant] suit produce[s]."  Id.

28

warning); see Crawford-El v. Britton, 523 U.S. 574, 597 (1998) (reiterating that "firm application of the Federal Rules of Civil Procedure is fully warranted" in prisoner cases). The court (and each defendant) should be able to read and understand plaintiff's pleading within minutes. McHenry, 84 F.3d at 1177. A long, rambling pleading, including many defendants with unexplained, tenuous or implausible connection to the alleged constitutional injury or joining a series of unrelated claims against many defendants will likely result in delaying the review required by 28 U.S.C. § 1915 and an order dismissing plaintiff's action pursuant to Fed. R. Civ. P. 41 for violation of these instructions.

## XIV. CONCLUSION AND ORDERS

In conclusion, the Court determines that plaintiff's FAC must be dismissed because he has joined, in one pleading, unrelated claims against dozens of different defendants that do not all arise from the same transaction or occurrences, and plaintiff fails to demonstrate he can allege facts showing "systemic retaliation." Plaintiff is granted leave to file a second amended complaint in which he raises **only those claims arising from the same transaction**, occurrence, or series of transactions and occurrences in which all of the named defendants were involved. In addition, if plaintiff files a second amended complaint, plaintiff should not renew retaliation or other claims unless they are based on incidents where the Court found plaintiff stated a potentially **cognizable** claim as outlined above.

In accordance with the above, IT IS HEREBY ORDERED that:

1. Plaintiff's requests to proceed in forma pauperis (ECF Nos. 3, 23) are granted.

2. Plaintiff is obligated to pay the statutory filing fee of $350.00 for this action. Plaintiff is assessed an initial partial filing fee in accordance with the provisions of 28 U.S.C. § 1915(b)(1). All fees shall be collected and paid in accordance with this court's order to the Director of the California Department of Corrections and Rehabilitation filed concurrently herewith.

3. Plaintiff's motion to submit a complaint larger than 25 pages (ECF No. 12) is granted.

4. Plaintiff's motion to amend (ECF No. 16) is denied as moot.

5. Plaintiff's first amended complaint (ECF No. 17) is dismissed.

6.  Within thirty days from the date of this order, plaintiff shall complete the attached Notice of Amendment and submit the following documents to the court:

a.  The completed Notice of Amendment; and

b.  An original of the Second Amended Complaint, which is limited to 25 pages. Plaintiff's second amended complaint shall comply with the requirements of the Civil Rights Act, the Federal Rules of Civil Procedure, and the Local Rules of Practice.  The second amended complaint must also bear the docket number assigned to this case and must be labeled "Second Amended Complaint."  **Plaintiff's second amended complaint shall not exceed 25 pages.** In addition, plaintiff's second amended complaint must only include claims involving the same defendant or defendants and arising from the same transaction, occurrence, or series of transactions and occurrences.  Unrelated claims must be brought in separate actions.  Failure to file a second amended complaint in accordance with this order may result in the dismissal of this action.

Dated:  September 02, 2025

CHI SOO KIM
UNITED STATES MAGISTRATE JUDGE

/1/kend401.14.rev

41

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    ADAM MICHALE KENDALL,                    No. 2:24-cv-3801 DAD CSK P

              Plaintiff,
12

13        v.                                   NOTICE OF AMENDMENT

14    BRAZIL, et al.,

              Defendants.
15

16

17        Plaintiff submits the following document in compliance with the court's order

18    filed on _____ (date).

19

20                        ☐          Second Amended Complaint

21                          (Check this box if submitting a Second Amended Complaint)

22

23    DATED:

24                                         _____
                                           Plaintiff
25

26

27

28